No. 08-3650

# In the United States Court of Appeals for the Third Circuit

IN RE:  GLOBAL INDUSTRIAL TECHNOLOGIES, INC., ET AL.

HARTFORD ACCIDENT AND INDEMNITY COMPANY, ET AL.,

*Appellants,*

v.

GLOBAL INDUSTRIAL TECHNOLOGIES, INC., ET AL.,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

## BRIEF FOR APPELLEES
## GLOBAL INDUSTRIAL TECHNOLOGIES, INC., *et al.*

Paul M. Singer, Esq.
James J. Restivo, Jr., Esq.
David Ziegler, Esq.

REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219
Phone: (412) 288-3131

*Counsel for Appellees Global Industrial Technologies, Inc., et al.*

## CORPORATE DISCLOSURE STATEMENT
## AND STATEMENT OF FINANCIAL INTEREST

Pursuant to Fed. R. App. P. 26.1 and Third Circuit LAR 26.1, Appellees Global Industrial Technologies, Inc. and its subsidiary debtor companies hereby make the following disclosure:

**A.    Global Industrial Technologies, Inc.** RHI AG is the ultimate corporate parent of Global Industrial Technologies, Inc. RHI Refractories Holding Company (a non-party) holds 100% of the stock of Global Industrial Technologies, Inc., and RHI AG (publicly held in Europe) ultimately owns 100% of the stock of RHI Refractories Holding Company.

**B.**    Global Industrial Technologies, Inc. holds 100% of the stock of all of the subsidiary debtor companies that are parties to this appeal. Those subsidiary debtor companies are as follows: Harbison-Walker Refractories Company; Indresco International, Ltd.; Harbison-Walker Refractories Europe, Ltd.; Harbison-Walker International Refractories, Inc.; Global Industrial Technologies Service Company; GPX Corp.,GIX Foreign Sales Corp.; Global Processing Systems, Inc.; TMPSC, Inc.; GPX Forge, Inc.; GPX Forge-Acquisition, Inc.; GPX Forge-U, Inc.; A.P. Green Industries, Inc.; A.P. Green Services, Inc.; A.P. Green Development Corp.; Detrick Refractory Fibers, Inc.; A.P. Green Refractories Corp.; Intogreen Co.; A.P. Green International, Inc.; Lanxide ThermoComposites; Chiam Technologies, Inc.; RHI Refractories Americas, Inc.; ANH Refractories Company, formerly known as RHI Services, Inc.; and RHI America Receivables Corporation.

RHI AG, a publicly held corporation that is not a party to this appeal, has a financial interest in the outcome of this appeal because it is the ultimate parent of the appellee-debtor companies listed above.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Global Industrial Technologies filed its Corporate Disclosure Statement and Statement of Financial Interest with the Court on September 19, 2008.

Dated:  January 30, 2009

/s/ James J. Restivo, Jr.
James J. Restivo, Jr.
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
(412) 288-3131

*Counsel for Appellees*
*Global Industrial Technologies, Inc.*
    *et al.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................... iv

PRELIMINARY STATEMENT............................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

STATEMENT OF THE ISSUES............................................................ 5

STATEMENT OF THE FACTS.............................................................. 6

    A.    The Debtors' Historical Operations And Products .............. 6

    B.    The Debtors' Bankruptcy Cases............................................ 7

    C.    Confirmation Of The GIT Plan ........................................... 10

SUMMARY OF ARGUMENT .............................................................. 11

ARGUMENT ........................................................................................ 14

I.    The Lower Courts Correctly Found That The APG Silica
    Trust Was A Necessary And Appropriate Part Of The
    Debtors' Reorganization.............................................................. 14

    A.    The Record Establishes That There Are Today, And
        Will Be In The Future, Thousands Of A.P. Green Silica
        Claims Against The Debtors .............................................. 16

    B.    The Record Establishes That Without The
        APG Silica Trust, The Debtors Would Jeopardize
        Their Reorganization By Spending Their Limited
        Resources Defending And Settling APG Silica Claims...... 18

    C.    Based On The Record Evidence, The Creation
        Of The APG Silica Trust And The Issuance Of The
        Channeling Injunction Were Lawful And Appropriate. .... 21

        1.    The APG Silica Trust And Injunction Are
            Necessary To The Debtors' Reorganization ............ 23

        2.    The APG Silica Trust And Injunction
            Are Fair And Equitable ........................................... 24

a.     The Creditors' Overwhelming Vote
In Favor Of Confirmation Reflects
The GIT Plan's "Fairness"............................................ 24

b.     The APG Silica Trust Provisions Satisfy,
By Analogy, The Requirements Of § 524(g),
Further Evidencing Their "Fairness"......................... 25

    (i)     The APG Silica Trust Comports
With § 524(g)(2)(B)(i)...................................... 26

    (ii)    The APG Silica Trust Comports
With § 524(g)(2)(B)(ii)..................................... 27

    (iii)   The APG Silica Trust Comports
With § 524(g)(4)(B) .......................................... 29

3.     The Bankruptcy Court's Approval Of The
APG Silica Trust Was Supported By Extensive
Findings Of Fact....................................................... 30

II.     The Lower Courts' Decisions Regarding The Assignment Of
The Debtors' Rights To Insurance Proceeds To The APG
Silica Trust Are Well-Grounded In The Law ............................. 30

A.     The Insurers' Failure To Raise Their Preemption
Argument Before The Bankruptcy Court Precludes
Them From Raising It In This Appeal ............................. 31

B.     The Assignment Of The Debtors' Insurance Rights
To The APG Silica Trust Is Appropriate Under State
Insurance Coverage Law ................................................ 36

C.     The Lower Courts Were Correct In Concluding
That Federal Bankruptcy Law Preempts State Law......... 39

III.    Because the GIT Plan Is Insurance Neutral, Hartford
And Century Lacked Standing To Object To Confirmation,
And None Of The Insurers Have Standing To Appeal The
Confirmation Order........................................................... 40

A.     Standing Is A Threshold Issue That Requires
The Complainant To Be "Injured" ................................. 41

1.    Standing To Object To The Confirmation
Of A Plan Of Reorganization Requires A
"Genuine," "Concrete" And "Imminent" Injury ..................... 41

2.    Standing To Appeal In A Bankruptcy Proceeding
Requires A Heightened Showing Of "Injury" ........................ 43

B.    The GIT Plan Is "Insurance Neutral" ................................................. 43

C.    Because The "Insurance Neutral" GIT Plan Does
Not Injure Hartford Or Century, Neither Had Standing
To Object To Confirmation Of The GIT Plan.................................... 45

D.    Because None Of The Insurers Are "Persons Aggrieved"
By Confirmation Of The GIT Plan, None Of Them Have
Standing To Prosecute This Appeal ................................................. 46

IV.    The Plan Provides An Appropriate, Equitable Process For
Resolving Silica Claims, And Does Not Violate Bankruptcy
Code § 502(a) .......................................................................................... 50

A.    The Plan Is Not Inconsistent With § 502, Nor Does
§ 502 Give The AIG Member Companies Any
Additional Basis To Object To The GIT Plan.................................... 51

B.    The Debtor's Decision Not To Pursue All Possible
Defenses To Silica Claims Is Reasonable And Equitable................ 53

C.    Congress Has Specifically Recognized The Need
For Special Claims Resolution Procedures In
Mass Tort Cases ............................................................................. 55

CONCLUSION ................................................................................................. 57

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Cmte.*,
    321 B.R. 147 (D.N.J. 2005) ........................................................ 42

*Buncher Co. v. Official Cmte. of Unsecured Creditors*,
    229 F.3d 245 (3d Cir. 2000) ...................................................... 35

*Class Five Nev. Claimants v. Dow Corning Corp.(In re Dow
    Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002) .......................... 21

*Continental Cas. Co. v. Medical Protective Co.*, 859 S.W.2d 789
    (Mo. Ct. App. 1993).................................................................. 37

*DiFederico v. Rolm Co.*, 201 F.3d 200 (3d Cir. 2000) ................................15

*Egger v. Gulf Ins. Co.*, 903 A.2d 1219 (Pa. 2006)................................... 38

*Fair Hous. Council of Suburban Phila. v. Montgomery
    Newspapers*, 141 F.3d 71 (3d Cir. 1998)..................................... 41

*First Union Commercial Corp. v. Nelson, Mullins, Riley &
    Scarborough*, 81 F.3d 1310 (4th Cir. 1996) .............................. 52

*General Motors Acceptance Corp. v. Dykes (In re Dykes)*,
    10 F.3d 184 (3d. Cir. 1993) ...................................................... 43

*Gillman v. Continental Airlines, Inc. (In re Continental
    Airlines)*, 203 F.3d 203 ............................................. 15, 22, 23, 30

*Gopher Oil Co. v. America Hardware Mut. Ins. Co.*,
    588 N.W.2d 756 (Minn. Ct. App. 1999)...................................... 37

*Greenblatt v. Steinberg* 339 B.R. 458 (N.D. Ill. 2006)............................. 35

*In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) ......................... 56

*In re Ampace Corp.*, 279 B.R. 145 (Bankr. D. Del. 2002) .................... 52

*In re A.P.I., Inc.*, 331 B.R. 828 (Bankr. D. Minn. 2005) ................. 44, 46

*In re Combustion Engineering, Inc.*, 391 F.3d 190
(3d Cir. 2004).................................................................. *passim*

*In re Dow Corning Corp.*, 287 B.R. 396 (E.D. Mich. 2002).................................. 23

*In re Federal-Mogul Global Inc.*, 385 B.R. 560 (Bankr. D. Del. 2008)................. 35

*In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006)........................... 44

*In re Kaiser Group Int'l, Inc.*, 399 F.3d 558 (3d Cir. 2005)........................ 35

*In re Kroner*, 935 F.2d 317 (7th Cir. 1992) .......................................... 35

*In re Martin Paint Stores*, 199 B.R. 258 (Bankr. S.D.N.Y. 1996) .................. 43, 46

*In re Natale*, 280 Fed. Appx. 227, 2008 WL 2154741
(3d Cir. May 23, 2008) ........................................................ 35

*In re Pittsburgh Corning Corp.*, 260 Fed. Appx. 463,
2008 WL 101747 (3d Cir. Jan. 10, 2008)........................................46-47, 48

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)........................... 43

*In re Sterten*, 546 F.3d 278 (3d Cir. 2008)..................................... 15

*In re Sugarhouse Realty, Inc.*, 192 B.R. 355 (E.D. Pa. 1996) ................... 52

*In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d Cir. 2007)................ 36

*J.H. France Refractories Co. v. Allstate Ins. Co.*,
626 A.2d 502 (Pa. 1993)........................................................ 37

*Lewis v. Casey*, 518 U.S. 343 (1996) ......................................... 43

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................... 42

*MacArthur v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d Cir. 1988) ..................... 21, 22, 56

*Magers v. National Life & Acc. Ins. Co.*, 329 S.W.2d 752
(Mo. 1959) .................................................................. 38

*McLaren v. Imperial Cas. & Indem. Co.*, 767 F. Supp. 1364
(N.D. Tex. 1991).............................................................. 38

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
    880 F.2d 694 (4th Cir. 1989) ............................................................. 21-22, 23

*OneBeacon America Ins. Co. v. A.P.I., Inc.*, No. Civ. 06-167 (JNE),
    2006 WL 1473004 (D. Minn. May 25, 2006) ............................................. 37

*Phillips v. A-Best Products Co.*, 665 A.2d 1176 (Pa. 1995) .................................... 53

*Pilgrim Enters., Inc. v. Maryland Cas. Co.*, 24 S.W.3d 488
    (Tex. App. 2000) ............................................................................................ 37

*Public Interest Research Group of New Jersey, Inc. v.*
    *Magnesium Electron, Inc.*, 123 F. 3d 111 (3d Cir. 1997) .............................. 42

*SEC v. Drexel Burnham Lambert Group, Inc.*
    *(In re Drexel Burnham Lambert Group, Inc.)*,
    960 F.2d 285 (2d Cir. 1992) .................................................................. 21, 23

*Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293
    (3d Cir. 2003) ........................................................................................... 41-42

*Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737 (3d Cir. 1995) ............. 43, 48-49

*UNARCO Bloomington Factory Workers v. UNR Indus., Inc.*,
    121 B.R. 268 (N.D. Ill. 1990) ....................................................................... 56

*Valley Forge Christian College v. Americans United for Separation*
    *of Church & State, Inc.*, 454 U.S. 464 (1982) .............................................. 44

*Vermont Ag. of Natural Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2001) ....................................................................................... 42

*Viola v. Fireman's Fund Ins. Co.*, 965 F. Supp. 654 (E.D. Pa. 1997) ................... 38

*Warth v. Seldin*, 422 U.S. 490 (1975) .................................................................... 41

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .................................................. 41, 42

## STATUTES AND RULES

11 U.S.C.

    § 105(a) ............................................................................ *passim*

    § 502 ................................................................................. *passim*

    § 524(g) ............................................................................ *passim*

    § 1109 ...................................................................................... 42

    § 1123(a) .......................................................................... *passim*

    § 1123(b) .................................................................................. 21

    § 1128 ...................................................................................... 42

    § 1334(a) .................................................................................... 4

    §1334(b) ..................................................................................... 4


28 U.S.C.

    §157(a) ....................................................................................... 4

    §158(d) ....................................................................................... 5

    §1291 ......................................................................................... 5


Federal Rules of Bankruptcy Procedure

    Rule 9019 ............................................................................ 51-52

## LEGISLATIVE MATERIALS

140 Cong. Rec. H10752 (1994) ................................................................. 25

140 Cong. Rec. H10765 (1994) ................................................................. 25

## OTHER AUTHORITIES

*Couch on Insurance 3d* § 35.7 (1999) .................................................... 36-37

## PRELIMINARY STATEMENT

This appeal addresses the confirmation of the plan of reorganization of Global Industrial Technologies, Inc. ("GIT") and its affiliates (collectively, the "Debtors"). This plan of reorganization (the "GIT Plan")[1] provides a solution for enormous asbestos and silica liabilities arising from the products and historical operations of two sister companies, Harbison-Walker Refractories Company ("Harbison") and A.P. Green Refractories Co. (now known as A.P. Green Industries, Inc.) ("A.P. Green"). The GIT Plan will resolve hundreds of thousands of claims that are either pending now or expected in the future, providing relief to claimants, creditors and the Debtors.

Appellants challenge the creation of a trust to address the thousands of silica-related product liability claims against A.P. Green (the "APG Silica Trust"). Appellants' objections notwithstanding, the APG Silica Trust is fair and necessary to the Debtors' plan of reorganization, and is appropriate as a matter of law.

The undisputed evidence offered at the confirmation hearing established that 169 A.P. Green silica claims were pending as of the date the Debtors petitioned for bankruptcy protection, and that prior to the Chapter 11 filing its insurers had paid

---

[1]    "GIT Plan" refers to the Third Amended Plan of Reorganization of Global Industrial Technologies, Inc., *et al.*, Dated December 28, 2005, as Supplemented. Copies of the GIT Plan and selected attachments are in Volume V of the Joint Appendix beginning at JA2877.

nearly $250,000 to defend, and $65,000 to resolve, A.P. Green silica claims. The evidence also showed that, while crafting the GIT Plan, the Debtors learned of the sizable silica liability problems facing similar refractory producers Harbison and General Refractories Company (a former A.P. Green competitor whose assets A.P. Green acquired in 1994), and other industrial companies. Indeed, by the time the third amended GIT Plan was filed in December 2005, Harbison had resolved more than 18,000 silica claims at a cost of $110 million, and General Refractories had received approximately 10,000 silica claims over a period of nearly ten years.

The evidence also established the magnitude of A.P. Green's silica problem. Some 4,600 silica claims had been presented to the Debtors under penalty of perjury prior to completion of the confirmation hearing, and expert testimony established that the Debtors could expect between 10,360 and 23,304 more A.P. Green silica claims in the future. The evidence also established that the cost of those claims would overwhelm the Debtors' ability to reorganize if the claims remained in the tort system.

It was for these reasons -- and not as the result of the unsubstantiated conspiracy theory the Appellants conjure in their brief -- that the GIT Plan needed to include the APG Silica Trust. The lower courts correctly found that the APG Silica Trust is a fair, necessary, and legally appropriate part of the Debtors' reorganization effort.

The only objections to confirmation of the GIT Plan were those of the Appellants -- insurers that issued policies providing coverage for A.P. Green silica liabilities. Under the GIT Plan, the Debtors' rights to insurance proceeds for such claims are assigned to the APG Silica Trust. The Bankruptcy Court properly found that the assignment was permissible as a matter of insurance coverage law and bankruptcy law, consistent with this Court's decision in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004). The Bankruptcy Court also properly held that two of the Appellants -- Hartford and Century -- lacked standing to object to the GIT Plan's confirmation.

The AIG Member Companies, holders of a highly contingent unliquidated claim against the APG Silica Trust, appeal on the additional ground that the GIT Plan treats them unfairly as potential trust claimants. The alleged harm to the AIG Member Companies, however, is insufficient to meet the "person aggrieved" test for standing in a bankruptcy matter. Moreover, their objection defies bankruptcy law and common sense, and is not a basis to overturn the delicate compromise embodied in the GIT Plan and the APG Silica Trust.

In sum, this appeal is being pursued by insurance companies that are not harmed under the GIT Plan, to the unfair detriment of the Debtors and the creditor classes that overwhelmingly voted in favor of confirmation. These insurers rely on speculation and surmise, rather than record evidence, to effectuate their attack.

Because both the Bankruptcy Court and District Court acted properly in confirming/affirming the GIT Plan, this Court should affirm those rulings.

## JURISDICTIONAL STATEMENT

The District Court had original jurisdiction over the Debtors' Chapter 11 cases pursuant to 11 U.S.C. § 1334(a). The District Court referred those cases to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a), and the Bankruptcy Court had jurisdiction over plan confirmation proceedings under 11 U.S.C. § 1334(b).

The Bankruptcy Court had jurisdiction to enter an order confirming certain aspects of the GIT Plan, but under § 524(g) of the Bankruptcy Code the District Court was required to affirm the GIT Plan's channeling injunction. The Bankruptcy Court issued a revised order and memorandum opinion confirming the GIT Plan on November 14, 2007, which included the creation of a trust to deal with present and future A.P. Green silica claims.[2] JA28-80; JA188-200. The Bankruptcy Court also issued an order striking the objections of Hartford and Century for lack of standing. JA202, JA209. Appellants filed timely notices of appeal to the District Court. JA3045-3054.

---

[2]    The revised order and memorandum opinion superseded an original order and memorandum the Bankruptcy Court entered on September 24, 2007. JA2538-2550.

After briefing, the District Court entered an order affirming the Bankruptcy Court's confirmation of the GIT Plan and its decision on standing, and entered the plan's channeling injunction. JA26-27. Appellants filed timely notices of appeal to this Court on August 25, 2008. JA1-10. This Court has jurisdiction over this appeal under 28 U.S.C. §§ 158(d)(1) and 1291.

## STATEMENT OF THE ISSUES

I.      Where the record evidence established both the existence of thousands of present and future silica claims against the Debtors and the Debtors' financial inability to handle such claims outside of the bankruptcy proceeding, did the lower courts correctly rule that a § 105(a) channeling injunction for silica claims (and the creation of a silica trust) was necessary, fair and appropriate for the Debtors' reorganization? **(YES)**

II.     Did the lower courts correctly rule that the assignment of the Debtors' right to insurance proceeds to the silica trust was permissible under the Bankruptcy Code or, in the alternative, under state law? **(YES)**

III.    Where a bankruptcy plan contains "insurance neutrality" provisions broader than those endorsed by this Court in *Combustion Engineering*, did the lower courts correctly rule that: (a) two insurers lack standing to object to confirmation of that plan; and (b) no insurers are injured by the assignment of their rights to insurance proceeds to the silica trust? **(YES)**

- 5 -

IV.    Is the plan's resolution of silica-related claims through a trust

mechanism consistent with § 502, and does it provide an equitable and reasonable

solution for all silica trust claimants, including those whose claims are not silica

bodily injury claims? **(YES)**

## STATEMENT OF THE FACTS

### A.    The Debtors' Historical Operations And Products

GIT is the parent company of several subsidiaries that manufacture

refractory products for use in industrial applications.  GIT's subsidiaries include

A.P. Green and Harbison.  Both companies historically manufactured and sold

materials for use in industrial furnaces.  At various periods of time, A.P. Green and

Harbison operated as independent companies.  GIT was created as a holding

company by Harbison's predecessor in 1995, and GIT acquired A.P. Green in

1998.  JA810.[3]

Both Harbison and A.P. Green manufactured a small number of products

that contained asbestos.  JA813; JA820.  These products, which were sold for use

in similar applications, ultimately gave rise to hundreds of thousands of asbestos

claims against each company before their bankruptcy filings.  Each company

---

[3]    GIT was acquired by RHI AG in 1999.  JA810.  RHI AG is also the ultimate
parent of North American Refractories Company and its subsidiaries
("NARCO"), the debtor and an appellee in case no. 08-3651.

incurred hundreds of millions of dollars in defense and indemnity costs.  JA813-14; JA820.

Harbison and A.P. Green also produced many refractory products that contained silica.  JA1060.  These products ultimately led to pre-petition claims against them for silica-related injuries.  JA814; JA821.  Although the magnitude of the silica litigation (and resultant liability and defense costs) was smaller in comparison to the companies' pre-petition asbestos experience, the Debtors learned that silica claims could become the "new asbestos."  JA1070-73.

## B.    The Debtors' Bankruptcy Cases

By late 2001, the Debtors faced a multi-faceted crisis.  Unfavorable economic conditions led to a downturn in their business operations, while the exorbitant costs of toxic tort claims were consuming their assets and the efforts of their management.  JA1072-73.  Having no alternative, the Debtors filed petitions for reorganization under Chapter 11 of the Bankruptcy Code on February 14, 2002.  JA767; JA780.  Thereafter, the Debtors sought to prepare a plan of reorganization that would both resolve the most glaring problem they faced -- asbestos liability -- and that also would give the reorganized companies the best footing possible to operate profitably after emerging from bankruptcy.  JA1070-71.

Among the first major issues to be resolved were Harbison's asbestos and silica liabilities.  These liabilities were resolved through an agreement with DII

Industries, LLC ("DII"), the former owner of the Harbison business, and through DII's own bankruptcy proceeding, *In re Mid Valley, Inc.*, Bankr. No. 03-35592 (Bankr. W.D. Pa.). JA816. Under the parties' agreement, all of the Harbison asbestos and silica claims are being channeled to personal injury trusts created in the *Mid-Valley* case. JA816.

The Debtors next addressed the asbestos liabilities of A.P. Green. The GIT Plan created a § 524(g) trust for asbestos claims against A.P. Green, to be funded by a combination of stock in the reorganized Debtors and proceeds from certain insurance policy settlements. JA821-22.

The Debtors also concluded that, to be successful, their reorganization needed to address A.P. Green's silica liabilities. A.P. Green had a pre-bankruptcy history of being sued for silica-related bodily injuries (JA106-107), and during the bankruptcy proceedings, the Debtors became aware that silica litigation was becoming a fast-growing problem for similarly-situated companies (JA1058-1063).[4] The Debtors sought to resolve the problem of A.P. Green silica claims

---

[4] See *infra*, p. 16, for details of the silica litigation history of similarly-situated companies that the Debtors learned of during this bankruptcy case. Additionally, the Debtors further learned at that time that sand suppliers such as U.S. Silica Company had "tens of thousands" of silica cases outstanding in the 2003-2004 time period. JA1058-59. In fact, the Debtors discovered that while sand suppliers and protective gear manufacturers were the two main sets of defendants in these silica-related lawsuits, refractory companies had been identified at that time as one of the "most likely

*(Continued on following page)*

through the issuance of a § 105(a) channeling injunction and the creation of a trust

for the channeled silica claims (JA1070-71), to be funded by insurance settlement

proceeds and an assignment of the right to insurance proceeds under policies

issued by non-settling insurers (JA2891; JA2894-96).

The GIT Plan, which incorporated all of these elements, was filed in

December 2005. JA2891-2903. Hartford,[5] Century[6] and the AIG Member

Companies[7] -- non-settling insurers -- objected to the creation of the APG Silica

Trust, arguing that the A.P. Green silica claims did not pose a real problem to the

_____

*(Continued from previous page)*

upcoming defendants," according to legal industry conferences on silica litigation. JA1059.

[5]     "Hartford" includes Appellants Hartford Accident and Indemnity Company, First State Insurance Company, and Twin City Fire Insurance Company.

[6]     "Century" includes Appellants Century Indemnity Company, as successor to CIGNA Specialty Company (formerly known as California Union Insurance Company), and Westchester Fire Insurance company, for itself and for International Insurance Company (now known as TIG Insurance Company).

[7]     "AIG Member Companies" includes Appellants National Union Fire Insurance Company of Pittsburgh, PA, the Insurance Company of the State of Pennsylvania, Lexington Insurance Company, American Home Assurance Company, and any other entities related to American International Group, Inc. that engaged in business transactions with the Debtors.

Hartford, Century and the AIG Member Companies are referred to herein collectively as the "Appellants" or the "Insurers."

Debtors and that the Debtors would be able to handle the claims after bankruptcy without a trust.

In an effort to assuage these objections, the Debtors added "insurance neutrality" language to the GIT Plan. JA2903-04. This language, modeled on provisions this Court had endorsed in *Combustion Engineering*, expressly protected the insurers' defenses under their policies, with the exception of "anti-assignment" clause defenses. *Id.* On the basis of this insurance neutrality language, the Debtors moved to strike the objections of Hartford and Century for lack of standing -- since the GIT Plan preserves all of the insurers' coverage defenses and does not place any obligations on any insurer. JA201.

## C.    **Confirmation Of The GIT Plan**

Confirmation hearings on the GIT Plan took place on June 5 and 6 and October 26 and 27, 2006. Expert testimony established that the Debtors faced 4,636 present A.P. Green silica claims, and that they could expect to face as many as 23,000 additional claims in the future. JA1633-64. Expert testimony also established that the Debtors could not feasibly reorganize if forced to resolve these current and future claims without the APG Silica Trust. JA1730. The Insurers offered testimony of two expert witnesses who contested the conclusions offered by the Debtors' experts, but who failed to provide any independent estimates of the Debtors' liability for A.P. Green silica claims. JA1802-1834; JA1842-1902.

- 10 -

The Bankruptcy Court ruled in favor of confirmation of the GIT Plan in
September 2007, and subsequently entered a revised memorandum opinion,
findings of fact and conclusions of law, and confirmation order. JA2535-36;
JA28-200. The court also granted the Debtors' motion to strike the objections of
Hartford and Century, concluding that in this Circuit, "assignment of policy
proceeds is not prohibited by anti-assignment provisions in insurance policies."
JA202. The court held that the supposed violation of "anti-assignment" clauses in
the Debtors' policies did not give rise to any injury, since those provisions could
not legally prevent the assignment of the Debtors' rights to insurance proceeds in
this context. JA207-09.

The Insurers appealed the Bankruptcy Court's decisions (both as to standing
and as to confirmation) to the District Court, which affirmed. JA26-27. The
Insurers now appeal the lower courts' decision to this Court.

## SUMMARY OF ARGUMENT

I.     The lower courts applied the correct legal standards in finding that the
APG Silica Trust and channeling injunction were necessary to the GIT Plan. The
record evidence demonstrated that A.P. Green silica claims present a serious threat
to the Debtors' ability to reorganize. Although the Insurers challenged the
estimates of the Debtors' liability for A.P. Green silica claims as lacking merit, or

even as fraudulent, they failed to offer independent estimates to rebut the Debtors' case.

The Bankruptcy Court accordingly made no "clear error" in finding that the Debtors faced significant numbers of present and future silica claims which threatened their ability to successfully reorganize. The Bankruptcy Court's decision was extensively supplemented with specific findings of fact on that issue. Moreover, neither of the lower courts erred as a matter of law in determining that the APG Silica Trust and channeling injunction were necessary and fair under § 105(a), both according to this Circuit's standards for § 105(a) relief and according to an application of § 524(g) standards by analogy.

II.    The Insurers' objection to the Debtors' assignment of their rights to insurance proceeds to the APG Silica Trust, on the basis that the assignment improperly preempts state insurance coverage law, is not well-founded. None of the Insurers even raised or alluded to preemption as a basis for challenging the assignment before the Bankruptcy Court. Their failure to raise this argument before the Bankruptcy Court precludes them from making it here.

In any event, the assignment of these insurance rights to the trust was appropriate, both as a matter of state insurance law and federal bankruptcy law. The Bankruptcy Court correctly held that under state law, "anti-assignment" provisions cannot restrict assignments of insurance rights after the events giving

rise to liability have taken place -- as in this case, where the liability-causing events (claimants' exposure to silica) preceded the assignment. The lower courts also correctly followed this Court's decision in *Combustion Engineering*, which held that § 1123(a) of the Bankruptcy Code permits a Debtor to assign its right to insurance proceeds to a personal injury settlement trust, notwithstanding "anti-assignment" policy provisions.

III.    The assignment of the Debtors' rights to insurance proceeds does not impose any genuine, concrete, or imminent injury on Hartford or Century. Because the events giving rise to the Debtors' liability for channeled silica claims occurred prior to the assignment, the assignment does not increase the risks these companies insured. Additionally, these insurers' rights to limit or deny coverage for channeled silica claims are expressly preserved and protected through the GIT Plan's "insurance neutrality" provisions, which incorporate language this Court endorsed in *Combustion Engineering*. In short, neither Hartford nor Century satisfied the constitutional and statutory standing requirements to object to confirmation of the GIT Plan.

For the same reasons, Hartford and Century cannot make the heightened showing of impairment that is required for standing to appeal here. Nor can the AIG Member Companies, who, while creditors of the Debtors, settled with the Debtors as to all but their silica trust-related objections to the GIT Plan. Because

- 13 -

the GIT Plan does not directly affect any insurer's pecuniary interests, none have

standing to appeal the lower courts' orders.

IV.    The AIG Member Companies argue for the first time that the GIT

Plan violates § 502 of the Bankruptcy Code.  In addition to having waived this

argument by not raising it below, the argument lacks merit.  The AIG Member

Companies suggest that the Debtors must pursue defenses to various A.P. Green

silica claims through a § 502 allowance proceeding.  Such a process would

consume untold time and money, and would threaten to leave similarly-situated

claimants with greatly disparate recoveries.  Nothing in the Bankruptcy Code

compels the use of such a procedure.  To the contrary, the Bankruptcy Code

provides for the resolution of mass torts through settlement trusts such as the APG

Silica Trust, without having to revert to the allowance process.

## ARGUMENT

### I.    The Lower Courts Correctly Found That The APG Silica Trust Was A Necessary And Appropriate Part Of The Debtors' Reorganization.

In arguing that the lower courts erred in granting the Debtors a § 105(a)

injunction for silica claims and in approving the creation of the APG Silica Trust,

the Insurers attempt a sleight of the hand.  Although they contend that the issuance

of the § 105(a) injunction for silica claims is "unlawful," they do not argue that the

courts applied the wrong legal standard.  Rather, they contend that the injunction is

improper because they believe the silica claims against the Debtors are false -- or, stated differently, that the claims simply are not real.

The import of this argument is that the lower courts made a factual error, not a legal error, in determining whether the Debtors' silica problem is "real." This Court reviews a lower court's findings of fact for "clear error." *In re Sterten*, 546 F.3d 278, 282 (3d Cir. 2008). "Clear error" exists only where the bankruptcy court's findings are "either (1) completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) [bear] no rational relationship to the supportive evidentiary data." *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000) (citations omitted). Yet the Insurers do not contend that the lower courts clearly erred in finding that A.P. Green silica claims pose a serious threat to the Debtors' reorganization prospects; nor could they, given their wholesale failure to rebut the Debtors' abundant evidence that those claims seriously jeopardize their reorganization.

The record evidence supports the lower courts' determination that the APG Silica Trust and § 105(a) injunction:  (a) are necessary; (b) satisfy the standards set forth in *Gillman v. Continental Airlines, Inc (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000) and other cases involving § 105(a) injunctions; and (c) satisfy, by analogy, the standards of § 524(g). The lower courts' factual findings were not

clearly erroneous, and their legal conclusions as to the appropriateness of the APG

Silica Trust and § 105(a) injunction were correct.

### A.    The Record Establishes That There Are Today, And Will Be In The Future, Thousands Of A.P. Green Silica Claims Against The Debtors.

There is no dispute that thousands of A.P. Green silica claims are currently

pending against the Debtors.  One hundred sixty-nine silica claims were pending

against A.P. Green as of the petition date, and more than 4,600 claimants submitted

A.P. Green silica claims against the Debtors during the bankruptcy proceeding.

Each claim was submitted under penalty of perjury.  JA106-108.

The existence of these mass-tort silica claims is consistent with the

experiences of similarly-situated defendants with similar products and operations.

Harbison had resolved at least 280 silica claims prior to its bankruptcy filing, and

an additional 18,212 silica claims against Harbison were resolved through the *Mid-*

*Valley* bankruptcy case.  JA111-112.  Likewise, approximately 10,000 silica claims

had been filed against General Refractories as of June 6, 2003, and another 2,219

silica claims were filed against it in 2004-05.  JA112-113.

Dr. Timothy Wyant, an expert biostatistician, estimated the total number of

future A.P. Green silica claims that would be filed against the Debtors.  JA107-

108.  He determined that between 482 and 1,084 claims would be filed annually,

and that the Debtors could expect between 10,360 and 23,304 claims through the

- 16 -

year 2050, in addition to the 4,636 claims currently pending. JA108-110. Dr.

Wyant's estimates were in line with the annual rate of silica claims filed against

Harbison (845 claims per year) and General Refractories (1,110 claims per year).

JA111-113.

While the Insurers argued in the confirmation hearings that many (or all)

current silica claims lack merit, they failed to offer any independent estimate of the

Debtors' future liability for A.P. Green silica claims. JA113. Instead, they offered

the testimony of Dr. Denise Martin, a statistician who criticized Dr. Wyant's

estimation methodology and conclusions (JA113-115),[8] but ultimately conceded

that Dr. Wyant had followed the same methodology her own firm used to estimate

future claims in *In re Swan Transport. Co.*, Bankr. No. 01-11690 (Bankr. D. Del.).

JA1807-11. The Insurers offered no other evidence that cast Dr. Wyant's analysis

into doubt.

In summary, the Insurers make the same unfounded factual contentions in

this appeal that the lower courts *rejected*. Because the Insurers do not contend

---

[8]     In this respect, Dr. Martin took the same approach her partner, Dr. Frederick
Dunbar, took in *Combustion Engineering* -- an approach this Court found to
offer no substantive insight. *See Combustion Engineering*, 391 F.2d at 241
n.54 (refusing to reject Dr. Wyant's estimate of future asbestos claims
against the debtor, because the debtors (through Dr. Dunbar) failed to offer
any alternative estimate, and because the lower courts made no findings
contrary to Dr. Wyant's estimate).

(much less establish) that the Bankruptcy Court committed clear error when it found, based on the record evidence, that the Debtors face significant numbers of current and future claims, this Court should affirm those findings of fact and affirm the lower courts' rulings.

> **B.      The Record Establishes That Without The APG Silica Trust, The Debtors Would Jeopardize Their Reorganization By Spending Their Limited Resources Defending And Settling APG Silica Claims.**

Before the bankruptcy, A.P. Green's primary insurer spent $247,531 defending 17 silica bodily injury lawsuits, six of which settled for a total of $65,000 -- including a single silicosis case that settled for $50,000 -- for a paid-average of $10,833. JA106-107; JA112. The average defense cost for each suit was $14,000. JA106-107. There is no dispute that the average cost of defending silica bodily injury claims is approximately 30% of the cost of settling them. JA1751; JA1844.

Expert testimony by Kevin Nystrom demonstrated the Debtors' potential liability for APG silica claims. Mr. Nystrom utilized Harbison's pre-bankruptcy settlement value of $4,700, which was lower than Harbison's $6,485 average settlement value in the *Mid-Valley* bankruptcy and A.P. Green's $10,833 paid-average settlement value for pre-bankruptcy silica claims. JA112. Mr. Nystrom testified that if there were no trust to deal with the A.P. Green silica claims, and if new claims were filed at the mid-point of the ranges predicted by Dr. Wyant, the

Debtors would face silica liability in excess of $25 million during the first three years after the GIT Plan's effective date, and their total liability could reach $117 million.[9]  JA204.  He testified that the Debtors lacked sufficient cash flow, committed insurance assets, or borrowing capability to resolve liabilities of that magnitude.  JA138.

In response, the Insurers offered the testimony of Daniel Dooley.  Mr. Dooley simply imported Dr. Martin's criticisms of Dr. Wyant's claims estimate (which reduced the number of current claims from 4,636 to 376), and then theorized that the Debtors could afford to handle this small number of claims without a trust.  JA1865-66.  Mr. Dooley speculated that the Debtors could fund this litigation by diverting their insurance settlement proceeds away from the trust and to themselves -- although he admitted that this was "just an assumption" that lacked evidentiary support.  JA1850.[10]

---

[9]    Mr. Nystrom's estimate of the Debtors' total liability for A.P. Green silica claims resembled the $110 million paid to settle Harbison's silica liabilities in the *Mid-Valley* case.  JA111.

[10]    The Insurers incorrectly assert that the Debtors could fund the defense and settlement of silica claims through "approximately $31 million in insurance settlement proceeds that have been designated for the payment of silica claims."  Hartford/Century Br. at 26 n.13.  In fact, several of the settlements that comprise the settlement proceeds that the GIT Plan pledges to the APG Silica Trust state that those proceeds shall be payable *directly to personal injury trust(s) established under the GIT Plan. See* Federal Ins. Co. Settlement [Bankr. Dkt. 935], at § 2(a); Continental Cas. Co. Settlement

*(Continued on following page)*

Mr. Dooley further testified that any single large judgment in any single silica case could cause a default in the Debtors' financial covenants, causing irreparable harm to the reorganization.  JA1878.  He also conceded that it was far preferable for a Debtor to cap a liability (*i.e.* through the creation of a trust) rather than to allow it to proceed into the uncertain and hard-to-control environs of the tort system.  JA1878.

On appeal, the Insurers continue to contend that in the realm of silica litigation, it has become "easier" to defend "dubious" claims, and that the cost of handling the A.P. Green silica claims would be insignificant.  Hartford/Century Br. at 25-26.  Nevertheless, the record evidence supports the lower courts' factual findings as to the magnitude of the Debtors' potential liability for A.P. Green silica claims.  The lower courts made no "clear error" as to these findings, and their findings therefore should be affirmed.

---

*(Continued from previous page)*

[Bankr. Dkt. 1170], at §§ 1.27, 4.1, 4.2; Great American Ins. Co. Settlement [Bankr. Dkt. 1170], at §§ 1.3, 2.1; and Royal Indemnity Co. Settlement [Bankr. Dkt. 4159], at §§ 1.10, 2.1, 2.2.  Absent the APG Silica Trust, these monies would go directly to fund the APG Asbestos Trust, and would not be available to the Reorganized Debtors for funding silica litigation in the tort system.  The Insurers' suggestion that $31 million could be diverted in some other way is simply incorrect.

C.     **Based On The Record Evidence, The Creation
       Of The APG Silica Trust And The Issuance Of The
       Channeling Injunction Were Lawful And Appropriate.**

Section 105(a) of the Bankruptcy Code empowers the courts to "issue any

order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a). Section 1123(b)(6) further states that

a confirmable reorganization plan "may include any other appropriate provision

not inconsistent with the applicable provisions of" the Bankruptcy Code. 11

U.S.C. § 1123(b)(6).

Courts have relied on § 105(a) and § 1123(b)(6) to confirm plans that

include channeling injunctions and corresponding settlement trusts where "the

injunction plays an important part in the debtor's reorganization plan." *SEC v.*

*Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group,*

*Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *see also Menard-Sanford v. Mabey (In re*

*A.H. Robins Co.)*, 880 F.2d 694, 702 (4th Cir. 1989); *MacArthur v. Johns-Manville*

*Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988). Courts

have granted such injunctive relief in cases involving bodily-injury mass tort

claims and product liability claims against debtors. *See Class Five Nev. Claimants*

*v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir.

2002) (silicone breast implant claims); *Robins*, 880 F.2d at 702 (intrauterine

contraceptive device claims); *Johns-Manville*, 837 F.2d at 93-94 (asbestos claims, prior to the enactment of § 524(g)).

In *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213 (3d Cir. 2000), this Court held that a § 105(a) injunction may issue where "unusual circumstances" exist. In that case, the debtor sought confirmation of a reorganization plan that included a § 105(a) injunction for claims against its non-debtor officers and directors. This Court expressly declined to adopt a strict test for § 105(a) injunctive relief, in favor of a "more flexible approach . . . in the context of extraordinary cases." *Id.* This flexible approach requires the satisfaction of three "hallmarks of permissible non-consensual releases": "fairness, necessity to the reorganization, and specific factual findings to support these conclusions . . . ." *Id.* at 214.

The Court rejected the debtors' request for § 105(a) relief in *Continental* due to the absence of those "hallmarks," and expressed concern over the issuance of non-debtor releases. *See id.* at 215-16. This case presents a different situation: the Insurers object not to non-debtor releases in the GIT Plan, but to a § 105(a) injunction in favor of the Debtors themselves. That injunction, and the APG Silica Trust, were designed after the § 524(g) model. In fact, applying the § 524(g) analysis to the APG Silica Trust demonstrates that the trust and the channeling injunction are fair and appropriate under the *Continental* test, as well as the

standards applied by other courts for similar relief. The lower courts, which so found, thus should be affirmed.

### 1.    The APG Silica Trust And Injunction Are Necessary To The Debtors' Reorganization.

A § 105(a) injunction must be "necessary" to a debtor's reorganization in order to be appropriate. *Continental*, 203 F.3d at 214; *see also Drexel*, 960 F.2d at 293 (a § 105(a) injunction is appropriate where it plays an "important part" in debtor's reorganization); *Robins*, 880 F.2d at 702, and *In re Dow Corning Corp.*, 287 B.R. 396, 410-11 (E.D. Mich. 2002) (both approving injunctions that were "essential" to reorganizations). Courts have found such "necessity" in cases where the debtor faces claims that, absent the injunction, would derail or frustrate its reorganization. *See Robins*, 880 F.2d at 702; *Dow Corning*, 287 B.R. at 410-11; *see also Drexel*, 960 F.2d at 293 (approving injunction because, *inter alia*, it would cap claims against directors and officers, fostering resolution of all claims).

As described above, the Debtors face nearly 5,000 current silica claims, and can expect between 10,360 and 23,304 future claims through the year 2050. The cost of these claims likely would exceed $25 million for the first three years after the Debtors emerge from bankruptcy, and could reach $117 million by 2050. Expert testimony indicated that absent the APG Silica Trust, this liability would doom the Debtors' reorganization effort, and make another Chapter 11 proceeding

likely.  The APG Silica Trust provides an important cap on this liability, and is

necessary to the Debtors' attempt to successfully reorganize.

> **2.     The APG Silica Trust And Injunction
> Are Fair And Equitable.**

Multiple indicators, supported by record evidence, show that the APG Silica

Trust and channeling injunction satisfy the *Continental* hallmark of "fairness."

First, all creditor classes overwhelming supported confirmation of the GIT Plan,

reflecting that the GIT Plan equitably resolves their claims.  Second, the GIT

Plan's silica trust provisions satisfy (by analogy) each one of § 524(g)'s

requirements, thus providing additional confirmation that the APG Silica Trust is

"fair" to all constituencies.

> **a.     The Creditors' Overwhelming Vote In Favor Of
> Confirmation Reflects The GIT Plan's "Fairness".**

Unlike the Insurers, each of the creditor classes that were entitled to vote on

confirmation of the GIT Plan faced actual, imminent and measurable impact on its

interests due to the plan's compromises of their claims.  Nonetheless, each of these

voting classes voted overwhelmingly in favor of confirmation.  Specifically:

general unsecured creditors voted 97.77% in number (99.45% in value) in favor of

the GIT Plan; asbestos trust claimants voted 95.52% in number (93.71% in value)

in favor of the GIT Plan; and silica trust claimants voted 98.94% in number (and

97.15% in value) in favor of the GIT Plan.  JA147.

In voting in favor of the GIT Plan as a whole, silica- and non-silica claimants alike demonstrated a belief that the APG Silica Trust provisions are equitable to all creditors. These results reveal that no constituency whose interests were truly endangered by this bankruptcy proceeding believes the GIT Plan treats it inequitably.

> **b.    The APG Silica Trust Provisions Satisfy, By Analogy, The Requirements Of § 524(g), Further Evidencing Their "Fairness".**

Section § 524(g) of the Bankruptcy Code provides a useful framework for evaluating whether the creation of a silica trust is "fair" under *Continental*; indeed, § 524(g) itself arose from the application of § 105(a).[11] The record evidence establishes that the APG Silica Trust and the § 105(a) channeling injunction satisfy the requirements of § 524(g), further illustrating why the lower courts properly concluded that a silica trust is warranted under § 105(a).

---

[11]   Legislative history verifies that § 524(g) was modeled after the trust and the channeling injunction approved under § 105 in the *Johns-Manville* bankruptcy case. *See* 140 Cong. Rec. H10752, H10765 (1994) (noting that, in codifying the trust and injunction mechanisms in § 524(g), Congress set forth "explicit requirements simulating those met in the Manville case").

### (i)    The APG Silica Trust Comports With § 524(g)(2)(B)(i).

Section 524(g)(2)(B)(i)(I) requires that an asbestos trust assume the debtor's liabilities allegedly caused by asbestos, and § 524(g)(2)(B)(i)(IV) requires the trust to use its assets to pay asbestos claims and demands.  11 U.S.C. § 524(g)(2)(B)-(i)(I), (IV).  Here, the APG Silica Trust "shall assume all liabilities (whether now existing or arising at any time hereafter) for all APG Silica Trust Claims and APG Silica Demands."  JA2893-94.  The trust will use its assets to pay claims and demands arising from alleged exposures to A.P. Green's silica products and operations.  JA891-92 .

Sections 524(g)(2)(B)(i)(II) and (III) require that a trust be funded, in whole or in part, by the securities of the debtors and by the obligations of the debtors to make future payments to the trust, such that the trust will have funds adequate to pay for the claims channeled to it.  11 U.S.C. §§ 524(g)(2)(B)(i)(II)-(III).  In the GIT Plan (and the related plan in the NARCO case), the stock of the Reorganized Debtors is being split between the APG Asbestos Trust and the NARCO Asbestos Trust.  Although no stock is being contributed to the APG Silica Trust, the GIT Plan provides its own analogous, detailed funding process.

The APG Silica Trust will be funded by the transfer of $35.5 million in cash proceeds from insurance settlements approved by the Bankruptcy Court.  JA134; JA2894.  The trust also will receive the Debtors' rights to access insurance

proceeds for channeled claims under certain insurance policies issued to the

Debtors. JA2894. As such, the APG Silica Trust's funding will enable the trust to

discharge the claims tendered to it.

### (ii) The APG Silica Trust Comports With § 524(g)(2)(B)(ii).

To approve an asbestos trust, a court must find that the debtor likely will be

subject to substantial future demands for payment arising from its asbestos-related

activities. 11 U.S.C. § 524(g)(2)(B)(ii)(I). A court also must find that the actual

amounts, numbers and timing of the future demands cannot be determined.

11 U.S.C. § 524(g)(2)(B)(ii)(II).

Here, as discussed *supra*, p. 16-17, Dr. Timothy Wyant used accepted claims

forecasting methods to estimate that the Debtors will face between 10,360 and

23,304 future A.P. Green silica claims through the year 2050, with between 4,192

and 9,538 such claims to be filed through 2015. JA2075. Dr. Wyant testified that,

due to uncertainties in determining claim filing rates, no precise number of future

claims could be given, nor could he choose between his predicted upper and lower

ranges. JA2042. Thus, while the Debtors can expect a significant number of silica

claims, the actual number cannot be determined precisely.

Section 524(g)(2)(B)(ii)(III) requires that the pursuit of asbestos demands

outside the plan's prescribed procedures likely will threaten the plan's purpose to

deal equitably with asbestos claims and future demands. 11 U.S.C. § 524(g)(2)-

(B)(ii)(III). As the evidence showed, without the APG Silica Trust, the Debtors would face an immediate crisis upon exiting bankruptcy, with nearly 5,000 current claims pending that would demand a defense and, possibly, indemnification. Even more ominous for the Debtors' long-term viability are the future claims -- which Dr. Wyant predicted could exceed 23,000 -- that would consume the Reorganized Debtors' limited resources.

Without the APG Silica Trust, the Debtors will not have sufficient assets to defend and resolve all of the A.P. Green silica claims in the tort system. JA 138; JA2116. Accordingly, claimants who win a "race to the courthouse" stand a good chance of receiving full compensation for their damages, while later claimants will receive little or nothing for their injuries once the Debtors' limited assets are exhausted. The APG Silica Trust is designed to assure that present and future claimants are treated in substantially similar fashion, as required of § 524(g) asbestos trusts.

Just as § 524 (g)(2)(B)(ii)(IV)(aa) requires of asbestos trusts, the GIT Plan and the Disclosure Statement each set forth the provisions of the proposed channeling injunction for A.P. Green silica claims. JA2905-07; JA845-46. Consistent with § 524(g)(2)(B)(ii)-(IV)(bb), the GIT Plan also specifically classifies all holders of A.P. Green silica claims into one class (GIT Class 5-A) (JA2887). More than 75% of the members of that class voted in favor of the plan,

again consistent with § 524(g)(2)(B)(ii)-(IV)(bb); indeed, the class overwhelmingly supported confirmation, with approval majorities of approximately 98.94% by number, and 97.15% by value (JA2887).

Section 524(g)(2)(B)(ii)(V) requires an asbestos trust to operate through mechanisms that provide reasonable assurance that the trust will pay present claims and future demands in substantially the same manner. 11 U.S.C. § 524(g)(2)(B)-(ii)(V). The APG Silica Trust Agreement and APG Silica Trust Distribution Procedures ("TDP") contain provisions that will allow the APG Silica Trustee to manage disbursements to beneficiaries of the APG Silica Trust in a manner to ensure both the long-term viability of the trust and the equitable treatment of all silica claimants over the life of the APG Silica Trust. JA2929-58 (APG Silica Trust Agreement), JA2968-3006 (APG Silica TDP).

### (iii)    The APG Silica Trust Comports With § 524(g)(4)(B).

Finally, §§ 524(g)(4)(B)(i) and (ii) require that a representative of future claimants be appointed, and that the inclusion of the protected parties is fair and equitable to the holders of future demands whose claims will be channeled to the trust in light of the contributions made to the trust on behalf of the parties to be protected. 11 U.S.C. §§ 524(g)(4)(B)(i), (ii). Philip Pahigian was appointed as the Legal Representative for Silica Future Claimants, and he so testified. JA1151.

### 3. The Bankruptcy Court's Approval Of The APG Silica Trust Was Supported By Extensive Findings Of Fact.

The final *Continental* "hallmark" required for a § 105(a) injunction calls for the injunction to be supported by "specific findings of fact." *Continental*, 203 F.3d at 214. The Bankruptcy Court made 377 findings of fact and conclusions of law, scores of which directly address and support the creation of the APG Silica Trust. JA81-187. The final *Continental* "hallmark" therefore is satisfied, and the lower courts' decisions in support of confirmation and issuance of the silica channeling injunction should be affirmed.

## II. The Lower Courts' Decisions Regarding The Assignment Of The Debtors' Rights To Insurance Proceeds To The APG Silica Trust Are Well-Grounded In The Law.

The Insurers argue that: (a) the lower courts erroneously ruled that the Bankruptcy Code preempted state laws that would enforce "anti-assignment" clauses in the Debtors' insurance policies; and (b) those anti-assignment clauses prevented the Debtors from assigning their rights to proceeds under the policies to the APG Silica Trust. To the extent these arguments can be made here (given the Insurers' failure to raise them below), they are fatally flawed.

**A.    The Insurers' Failure To Raise Their Preemption Argument Before The Bankruptcy Court Precludes Them From Raising It In This Appeal.**

The Debtors' third amended plan of reorganization was filed on December 28, 2005, and contained provisions creating the APG Silica Trust. It provided for an assignment to the APG Silica Trust of the Debtors' rights to insurance proceeds under certain policies that may provide coverage for A.P. Green silica liabilities. Thus, since December 28, 2005, the Insurers have had notice of the Debtors' intention to assign certain of these insurance-related rights to the APG Silica Trust.

Each of the Insurers actively opposed the plan's confirmation during pre-confirmation litigation; and each participated in the June 5-6, 2006 confirmation hearings before Judge Fitzgerald.[12] Yet at no time did the Insurers assert that the proposed assignment rested on an improper preemption of state insurance coverage law. Rather, the Insurers objected primarily on the basis that the Debtors' silica liabilities were invited, invented or fraudulent.[13]

---

[12]    *See, e.g.,* JA960-1256 (June 5, 2006 Confirm. Hrg. Tr.); JA1257-1300 (June 6, 2006 Confirm. Hrg. Tr.); *see also* JA227-598 (Bankruptcy Court docket index setting forth scores of filings by each of the Insurers during the proceedings before the Bankruptcy Court leading up to the June 5-6, 2006 confirmation hearings).

[13]    *See generally* Obj. to Confirm. of Plan of National Union Fire Ins. Co. of Pittsburgh, PA and Related Companies to the Third Am. Plan of Global Indus. Techs., Inc., *et al.* Dated Dec. 28, 2005 [Bankr. Dkt. 5993]; Obj. to Confirm. Of Plan Dated Dec. 28, 2005, filed by California Union Ins. Co,

*(Continued on following page)*

After the June 5-6, 2006 confirmation hearings, the Debtors submitted plan

amendments that added an "insurance neutrality" provision to the GIT Plan.  The

provision incorporated language this Court endorsed in *Combustion Engineering*,

and added additional protective provisions.[14]  JA1498-99.  The insurance neutrality

---

*(Continued from previous page)*

International Ins. Co., Westchester Fire Ins. Co. [Bankr. Dkt. 5994]; Final
Obj. to Third Am. Plan of Reorg. of Global Indus. Techs., Inc., filed by
Travelers Indem. Co. & Affiliates [Bankr. Dkt. 5995]; Hartford's Obj. to
Plan of Reorg. of Debtors Dated Dec. 28, 2005 [Bankr. Dkt. 5996].  Some of
the Insurers *did* take issue with the assignment of insurance rights, but only
on state law grounds or as violative of specific Bankruptcy Code provisions.
*See* Bankr. Dkt. 5994, at 31-34 (raising state law arguments and suggesting
that the assignments violated § 365 of the Bankruptcy Code).

[14]    The GIT Plan's "insurance neutrality" provisions are located at § 4.4 of the
plan.  JA2903-04.  Section 4.4.1 of the GIT Plan is modeled on the
"neutrality provision" the district court added to Combustion Engineering's
plan.  *See Combustion Engineering*, 391 F.3d at 216 n.26.  Section 4.4.2 of
the GIT Plan is modeled on the "super-preemptory" provision in the
Combustion Engineering plan in the form drafted by the Bankruptcy Court,
rather than the District Court.  *See id.* at 209.  This Court found in
*Combustion Engineering* that due to the presence of the "neutrality"
provision and the "super-preemptory" provision in the plan, the objecting
insurers and the London Market insurers lacked standing to appeal the plan's
confirmation.  *See id.* at 218-19.

Section 4.4.3 of the GIT Plan provides even more protection that those two
sections, by declaring that:  (a) under no circumstances shall any person or
entity be permitted to assert "any legal or equitable theory against any
insurer" under any policy subject to the GIT Plan's assignment provisions as
to the existence or value of any claim tendered to the APG Silica Trust on
the basis of the presentment of a claim to the trust; and (b) neither the
presentment of a claim to the trust, nor the valuation, resolution and/or
payment of a claim by the trust, shall prejudice the right of any party in any

*(Continued on following page)*

provision specified that all of the insurers' defenses to coverage (except the "anti-assignment" defense) would be preserved.  This was reasonable, since under *Combustion Engineering* and state law principles, the policies' "anti-assignment" provisions could not be enforced to prohibit an assignment of this type.

The Debtors moved to strike the objections filed by Hartford and Century, arguing that the GIT Plan was "insurance neutral" and worked no injury upon those insurers, and that therefore, they lacked standing to object.[15]  This filing set off additional motion practice and briefing as to the standing of Hartford and Century.  Still, however, the Insurers never objected that the GIT Plan's

---

*(Continued from previous page)*

forum, and shall not be deemed a triggering event for liability under any policy subject to the GIT Plan's assignment provisions.  JA2903-04.

[15]  The Debtors' Motion to Strike cited *Combustion Engineering* to support the proposition that anti-assignment clauses in insurance policies do not restrict a debtor from assigning its right to proceeds for channeled claims to a bankruptcy personal injury settlement trust, pursuant to § 1123(a) of the Bankruptcy Code.  *See* Mot. to Strike Certain Insurers' Objs. and Witness Designations for Lack of Standing [Bankr. Dkt. 6375], at 8 & n.4.  Thus, to the extent a preemption issue was posed by the assignment contemplated in the GIT Plan, it was identifiable when the Debtors' filed this motion -- on July 21, 2006. The Debtors later notified the Bankruptcy Court of a recent Pennsylvania Supreme Court decision that held that as a matter of state insurance coverage law, anti-assignment provisions in an insurance policy could not preclude the insured's assignment of coverage once the events giving rise to the insured's liability had occurred.  *See* Not. of Recent Pa. Sup. Ct. Decision Regarding the Assignability of the Right to Receive Proceeds from Third Party Liability Insurance Policies [Bankr. Dkt. 6868].

assignment of the right to insurance coverage inappropriately preempted state law.[16]  After the confirmation hearings (in which Hartford and Century participated with full opportunities to litigate all issues), the Bankruptcy Court ruled that Hartford and Century lacked standing to object to plan confirmation.  JA207-209. The Bankruptcy Court also confirmed the GIT Plan, thereby approving the Debtors' assignment to the APG Silica Trust.  JA78-80.

Appellants raised their preemption argument for the first time in their appeal to the District Court.  The District Court, however, ruled that a straightforward application of *Combustion Engineering* permitted a debtor to assign its right to insurance proceeds to a trust created from the debtor's bankruptcy proceeding. JA22-24.

---

[16]  *See* Resp. of Certain Insurers to Debtors' Mot. to Strike Certain Insurers' Objs. to GIT Plan and Witness Designations for Lack of Standing [Bankr. Dkt. 6476]; Hartford's Resp. to Debtors' Mot. to Strike Certain Insurers' Objs. to GIT Plan and Witness Designations for Lack of Standing [Bankr. Dkt. 6477]; Tr. of Aug. 24, 2006 Hrg. (argument of Debtors' Motion to Strike) [Bankr. Dkt. 6544]; Supp. Resp. of Certain Insurers to Debtors' Mot. to Strike Certain Insurers' Objs. to GIT Plan and Witness Designations for Lack of Standing [Bankr. Dkt. 6613]; Hartford's Supp. Memo on Standing [Bankr. Dkt. 6615].  Although the Insurers now assert that the preemption argument was "raised" in the Debtors' Motion to Strike and in their responses thereto [Bankr. Dkt. 6476 and 6477] (*see* Hartford/Century Br. at 5 n.3), none of these briefs mentions preemption as a basis for objecting to the GIT Plan's assignment provisions.

"Generally, when party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal." *In re Natale*, 280 Fed. Appx. 227, 229, 2008 WL 2154741, at *2 (3d Cir. May 23, 2008) (citing *In re Kaiser Group Int'l, Inc.*, 399 F.3d 558, 565 (3d Cir. 2005)); *see also Buncher Co. v. Official Cmte. of Unsecured Creditors*, 229 F.3d 245, 253 (3d Cir. 2000). This rule applies not only to objections, but also to arguments that were raised (or that could have been raised) in briefs filed in support of objections. *See, e.g.*, *Greenblatt v. Steinberg*, 339 B.R. 458, 464 (N.D. Ill. 2006) (because "argument [regarding sale of assets] was not raised in the bankruptcy court . . . the "argument has been forfeited") (citing *In re Kroner*, 935 F.2d 317, 319 (7th Cir. 1992)).

In short, Appellants' failure to make their preemption argument before the Bankruptcy Court precludes them from making that argument now.[17]

---

[17]     Nothing in the record suggests that the Insurers could not have raised their preemption arguments before the Bankruptcy Court during the confirmation process. Indeed, other insurers have asserted preemption objections to bankruptcy courts in other cases involving a debtor's assignment of the right to insurance proceeds to a personal injury trust. *See, e.g.*, *In re Federal-Mogul Global Inc.*, 385 B.R. 560, 571 (Bankr. D. Del. 2008) (insurers asserting preemption objections to debtors' plan to assign right to insurance proceeds to § 524(g) trust).

- 35 -

**B.      The Assignment Of The Debtors' Insurance Rights To The APG
Silica Trust Is Appropriate Under State Insurance Coverage Law.**

The Bankruptcy Court cited both state insurance coverage law and federal

bankruptcy law in support of its decision that the Debtors' assignment of their right

to insurance proceeds  to the APG Silica Trust was permissible, and that the

assignment caused no injury to Hartford or Century.  JA201-209.  The Bankruptcy

Court's decision was correct on state law grounds, and should be affirmed on that

basis.[18]  *See In re Teleglobe Communications Corp.*, 493 F.3d 345, 385 (3d Cir.

2007) (appellate court may affirm on any ground in the record).

It is a widely recognized principle of insurance coverage law that

notwithstanding "anti-assignment" language in a policy, an insured's right to

proceeds under that policy can be assigned if the event giving rise to the insured's

liability took place before the assignment.  *See Couch on Insurance 3d* § 35.7

---

[18]    The insurers state that although the Bankruptcy Court addressed state
insurance law issues in its decision, "the parties agreed below that the
bankruptcy court's holding rested on its construction of the preemptive
effect of the Bankruptcy Code, not on state law."  Hartford/Century Br. at 29
n. 14.  This statement is erroneous, and the Insurers fail to cite any source to
support it.  In fact, before the District Court, the Appellees argued that the
Bankruptcy Court's decision was correct and proper under state insurance
law, in addition to being correct under 1123(a) of the Bankruptcy Code.  *See*
Hartford/Century Dist. Ct. Br. at 27 [Dist. Ct. Dkt. 11].  Nowhere did the
Appellees ever agree with the insurers that the Bankruptcy Court's decision
rested only on its interpretation of the Bankruptcy Code, nor have the
Appellees ever agreed that the lower courts' decisions on the assignment
issue could not properly be sustained as a matter of state law.

(1999). Courts have reasoned that "anti-assignment" clauses are used to prevent transfers of insurance agreements that would increase the risk the insurer agreed to insure. But where (as here) an assignment is made *after* an event causing liability has taken place, the assignment does not increase the insurer's risk level; it simply "reconnect[s] the policy's coverage to the insured loss." *OneBeacon America Ins. Co. v. A.P.I., Inc.*, No. Civ. 06-167 (JNE), 2006 WL 1473004, at *2-*3 (D. Minn. May 25, 2006) (citing *Gopher Oil Co. v. America Hardware Mut. Ins. Co.*, 588 N.W.2d 756, 763 (Minn. Ct. App. 1999)).

The liabilities being channeled to the APG Silica Trust arise from exposures to silica that took place prior to the Debtors' bankruptcy filing. JA137. For purposes of determining which insurance policies are "triggered" to provide coverage, the claimants' alleged injuries begin as of the time of the their exposure to silica from the Debtors' products and/or operations. *See, e.g., J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 506-07 (Pa. 1993); *Continental Cas. Co. v. Medical Protective Co.*, 859 S.W.2d 789, 792 (Mo. Ct. App. 1993); *Pilgrim Enters., Inc. v. Maryland Cas. Co.*, 24 S.W.3d 488, 498 (Tex. App. 2000). Because the allegedly injurious events have already taken place, triggering the alleged liability, the assignment changes nothing but the identity of the payee of the insurance proceeds for that liability.

Accordingly, "despite the presence of a non-assignment clause in an insurance contract, an assignment of the policy or rights thereunder after the occurrence of the event which creates the liability of the insurer is not precluded." *Egger v. Gulf Ins. Co.*, 903 A.2d 1219, 1226 (Pa. 2006) (citing *Viola v. Fireman's Fund Ins. Co.*, 965 F. Supp. 654, 658 (E.D. Pa. 1997)) (internal citations and quotations omitted); *see also Magers v. National Life & Acc. Ins. Co.*, 329 S.W.2d 752, 756 (Mo. 1959) ("As a general rule, an assignment made by the insured after the event has occurred on which liability under an insurance policy is predicated does not violate a policy provision prohibiting assignment of the policy or its benefits."); *McLaren v. Imperial Cas. & Indem. Co.*, 767 F. Supp. 1364, 1377 (N.D. Tex. 1991) (finding that Texas courts would "hold that the policy prohibition against assignment of an interest under the policy is inapplicable to the assignment of causes of action that have come into existence after the loss has occurred").[19]

Regardless of whether A.P. Green silica claims based on pre-bankruptcy exposures are filed against the reorganized Debtors in the tort system or against the

---

[19]    This rule is one of general applicability. However, the rulings cited above (from courts in Pennsylvania, Missouri and Texas) are of particular interest here. The policies that are subject to the GIT Plan's assignment provisions show that they were issued to either: (a) A.P. Green, while it maintained its principal place of business in Mexico, Missouri; (b) GIT, while it maintained its principal place of business in Dallas, Texas; or (c) RHI Refractories America (now known as ANH Refractories Company), while it maintained its principal place of business in Pittsburgh, Pennsylvania.

APG Silica Trust, the acts that gave rise to liability already occurred. In short, the situation that "anti-assignment" clauses are designed and intended to protect against is not present in this case.

The Bankruptcy Court properly relied on state insurance coverage law to support its finding that the "anti-assignment" language in the Debtors' policies could not restrict them from assigning their rights to the APG Silica Trust, and also correctly concluded that this assignment did not injure the Insurers. This Court should affirm on that ground, and need not reach the question of whether federal bankruptcy law preempts state law.

## C.    The Lower Courts Were Correct In Concluding That Federal Bankruptcy Law Preempts State Law.

The Bankruptcy Court and the District Court both found that the Debtors' assignment of their right to insurance coverage for A.P. Green silica claims was appropriate under this Court's decision in *Combustion Engineering*. JA202-05. The Insurers argue that the lower courts improperly read the Bankruptcy Code as preempting state insurance law -- law that they claim would forbid the assignment of *any* policy rights without the insurers' consent. This argument fails for a number of reasons.

*First*, as discussed above, state law does not support the Insurers' position; stated succinctly, there is no state law to preempt. "Anti-assignment" clauses could not have impeded this assignment, regardless of whether it was made to a

bankruptcy trust or to an entity wholly separate from a bankruptcy proceeding. Thus, to the extent bankruptcy law authorizes the assignment, it does so in the absence of any contrary state law.

*Second*, even if state law could not support the lower courts' decisions, those decisions were correct as a matter of bankruptcy law. As more fully set forth in the brief filed by the Official Committee of Asbestos Creditors and the Legal Representative for Asbestos Future Claimants, which the Debtors join, the lower courts properly found that under *Combustion Engineering*, a Debtor's rights to insurance proceeds may be assigned to a personal injury settlement trust created in a Chapter 11 plan of reorganization, notwithstanding any contractual provisions that purport to restrain the assignment of such rights.

## III. Because the GIT Plan Is Insurance Neutral, Hartford And Century Lacked Standing To Object To Confirmation, And None Of The Insurers Have Standing To Appeal The Confirmation Order.

Hartford's and Century's objections to the GIT Plan are precisely the type of abstract, hypothetical claims that standing doctrines are designed to weed out. Hartford and Century did not have standing to object to the confirmation of the GIT Plan, and neither they nor the AIG Member Companies meet the even stricter standard for appellate standing.

## A.    Standing Is A Threshold Issue That Requires The Complainant To Be "Injured".

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498 (1975); *Combustion Engineering,* 391 F.3d at 214. This is so whether a complainant seeks to be heard in a bankruptcy confirmation hearing, or seeks to appeal a bankruptcy court's confirmation order. *See Combustion Engineering*, 391 F.3d at 214.

### 1.    Standing To Object To The Confirmation Of A Plan Of Reorganization Requires A "Genuine," "Concrete" And "Imminent" Injury.

The doctrine of standing, in the context of objecting to confirmation of a plan of reorganization, consists of two aspects: a constitutional aspect, which serves as the "baseline" for standing in any given case; and a prudential aspect, which is expressed through rules that define and/or restrict standing in specific circumstances. *See Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 75 (3d Cir. 1998).

The Constitution requires a party seeking to be heard to demonstrate an "injury in fact" that is "concrete," "distinct and palpable" and "actual or imminent." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). A prospective or conjectural alleged "injury" cannot qualify as an "injury in fact" on which constitutional standing can be based. *Storino v. Borough of Point Pleasant Beach,*

322 F.3d 293, 297-98 (3d Cir. 2003) (plaintiffs lacked standing to challenge an ordinance where several contingencies would have to occur before any actual harm would befall their interests). Where a plaintiff claims standing based on a threatened injury, "the plaintiff must show that the threatened injury is so imminent as to be 'certainly impending.'" *Public Interest Research Group of New Jersey, Inc. v. Magnesium Electron, Inc.*, 123 F.3d 111, 122 (3d Cir. 1997) (quoting *Whitmore*, 495 U.S. 155-158).[20]

The Bankruptcy Code adds prudential standards for those seeking to object to the confirmation of a plan of reorganization. Section 1109 permits only "parties in interest" to raise objections and be heard in a Chapter 11 bankruptcy case, while § 1128 permits only "parties in interest" to object to the confirmation of a plan of reorganization. 11 U.S.C. §§ 1109(b), 1128(b). The term "party in interest" includes any entity with a potential pecuniary interest that is directly or adversely affected by a bankruptcy case (*see, e.g., Baron & Budd, P.C. v. Unsecured Asbestos Claimants Cmte.*, 321 B.R. 147, 158 (D.N.J. 2005)), but excludes persons

---

[20]    The "actual injury" requirement is one of three "irreducible constitutional minimum" requirements for standing. The other two are a causal connection between the injury and the conduct complained of, such that the injury is "fairly trace[able] to the challenged action of the defendant. . . ." (*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)), and a "substantial likelihood" that the requested relief will remedy the injury in fact (*Vermont Ag. of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2001)).

who merely are interested in the result of a bankruptcy proceeding (*see In re Martin Paint Stores*, 199 B.R. 258, 264 (Bankr. S.D.N.Y. 1996)).

> ## 2.    Standing To Appeal In A Bankruptcy Proceeding Requires A Heightened Showing Of "Injury".

"Standing to appeal in a bankruptcy case is limited to 'persons aggrieved' by an order of the bankruptcy court." *Combustion Engineering*, 391 F.3d at 214 (citing *General Motors Acceptance Corp. v. Dykes (In re Dykes)*, 10 F.3d 184, 187 (3d Cir. 1993). To be a "person aggrieved," an appellant must show that the bankruptcy court's order "diminishes [its] property, increases [its] burdens, or impairs [its] rights." *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000).

Appellate standing is denied to marginal parties who have insinuated themselves into a proceeding, and "who, even though they may be exposed to some potential harm incident to the bankruptcy court's order, are not 'directly affected' by that order." *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 741 (3d Cir. 1995). A person cannot appeal a bankruptcy court order unless that person meets this heightened test for injury *and* shows that those injuries were occasioned by the precise matter on which he seeks to appeal. *See Combustion Engineering*, 391 F.3d at 215 (citing *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

## B.    The GIT Plan Is "Insurance Neutral".

The GIT Plan's "insurance neutrality" provisions were modeled, in part, on the "insurance neutrality" provisions this Court endorsed in *Combustion*

*Engineering*. Sections 4.4.1 and 4.4.2 of the Debtors' "insurance neutrality provisions" are nearly identical to the originally-drafted versions of the "insurance neutrality" and "super-preemptory" provisions in the *Combustion Engineering* case. The only substantive modification the Debtors made to the language endorsed in *Combustion Engineering* was to exclude from protection the Insurers' purported "anti-assignment" defenses -- since as a matter of law, those defenses are now inoperative. The Debtors provided additional protection to insurers by adding § 4.4.3 to their "neutrality provisions," modeled on language utilized in *In re A.P.I., Inc.*, 331 B.R. 828 (Bankr. D. Minn. 2005).[21]

By adding the "insurance neutrality" provisions in § 4.4 of the GIT Plan, the Debtors went above and beyond the measures this Court found necessary to make a

---

[21]    *A.P.I.* involved a debtor's attempt to create a trust for asbestos-related claims funded, in part, by an assignment of insurance rights. Certain insurers objected to confirmation of the plan, arguing that the debtor's assignment of insurance rights would alter the pre-bankruptcy relationship between the debtors and their insurers. 331 B.R. at 860. The debtor included "insurance neutrality" language in its plan to protect the rights of its insurers; the language strongly resembled that which was included as § 4.4.3 of the GIT Plan. *Compare id. with* JA2903-04. Finding that the debtor's neutrality language adequately protected the insurers' interests, the *A.P.I.* court concluded that the insurers were left with only "generalized grievances" that could not justify allowing them standing to object to the plan's confirmation. *See id.* at 858 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)). A somewhat similar "insurance neutrality" provision also was approved by the Bankruptcy Court and the District Court in *In re Kaiser Aluminum Corp.*, Bankr. No. 02-10429 JKF (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R. 88 (D. Del. 2006).

plan of reorganization "insurance neutral" in *Combustion Engineering*. The

Debtors have ensured that, although their plan transfers the right to insurance

proceeds to the APG Silica Trust, it preserves and protects all of the coverage

defenses the Insurers otherwise would have with respect to those policies.

### C. Because The "Insurance Neutral" GIT Plan Does Not Injure Hartford Or Century, Neither Had Standing To Object To Confirmation Of The GIT Plan.

Hartford and Century are not creditors of the Debtors' estate. Rather, they

claim to have been injured by the GIT Plan's effect on policies under which the

rights to insurance proceeds for A.P. Green silica claims are being transferred to

the APG Silica Trust. Notwithstanding this transfer, however, these insurers are in

the same position as they were before the Debtors entered bankruptcy.

Today -- just as on the day before the Debtors' bankruptcy filing -- not one

silica claim has been submitted to either of these insurers for coverage. Indeed,

neither Hartford nor Century has admitted that it even *issued* any of the policies

involved in the GIT Plan.[22] Nothing in the GIT Plan requires the APG Silica Trust

to ever seek coverage from these insurers' policies. Moreover, every defense

available to these insurers to justify denying coverage for silica claims (except the

defunct "anti-assignment" defense) has been preserved.

---

[22]     *See, e.g.*, Hartford/Century Dist. Ct. Br. at 9 [Dist. Ct. Dkt. 11] (describing the policies as "allegedly issued" by the Insurers).

For these reasons, confirmation of the GIT Plan has caused Hartford and Century no "injury" that could satisfy the applicable constitutional and prudential tests for standing to object to its confirmation. Rather, Hartford and Century merely have a "generalized grievance" about the plan's "fairness," which does not entitle them to raise objections during the confirmation proceedings.[23] *See A.P.I.*, 331 B.R. at 858-860; *Martin Paint Stores*, 199 B.R. at 264. The lower courts properly concluded that Hartford and Century lacked standing to object to the confirmation of the GIT Plan. Those decisions should be affirmed.

**D.    Because None Of The Insurers Are "Persons Aggrieved" By Confirmation Of The GIT Plan, None Of Them Have Standing To Prosecute This Appeal.**

Regardless of whether Hartford and Century had standing to object to plan confirmation, they abundantly fail to meet the more restrictive standard for standing to appeal. As this Court demonstrated in *In re Pittsburgh Corning Corp.*,

---

[23]    The Insurers' reliance on *Clinton v. New York*, 524 U.S. 417 (1998), and other cases in which allegedly "remote" injuries were nevertheless found to give rise to constitutional standing are inapposite. None of those cases involved a plan of reorganization that expressly protected against the very types of alleged injuries that could have given rise to standing, as is the case here. The Insurers also ignore the fact that standing to object to the confirmation of a plan is subject to an even higher standard than the minimal requirements for constitutional standing. *See In re Fuller-Austin Insulation*, No. 98-2038-JDF, 1998 WL 812388, at *3 (D. Del. Nov. 10, 1998) (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1987) (Section 1128(b) "party in interest" standard is "more exacting than the constitutional case or controversy requirement")).

260 Fed. Appx. 463, 2008 WL 101747 (3d Cir. Jan. 10, 2008), insurance

companies that appeal based on "speculative" injuries that are "far removed" from

the challenged order cannot meet the restrictive test for appellate bankruptcy

standing.  260 Fed. Appx. at 466, 2008 WL 101747 at *2.  Analogous to the

insurers in *Pittsburgh Corning*, Hartford and Century have not established that

confirmation of the GIT Plan will result in any actual harm to them.

The AIG Member Companies similarly lack standing to prosecute this

appeal.  Although the AIG Member Companies were creditors of the Debtors, they

reached a settlement with the Debtors that left their fixed and liquidated claims

unimpaired (JA2441-2453), thus resolving all of their objections to the GIT Plan

except those pertaining to the APG Silica Trust (JA2450).  Their remaining

objections focus solely on the propriety of the APG Silica Trust and its possible

effect on their highly contingent claim against that trust;[24] such objections are

---

[24]   The AIG Member Companies' claim against the APG Silica Trust arises
from their contractual right to receive payments as a condition to providing
coverage for silica claims under policies (and related agreements) issued to
the Debtors and to General Refractories. JA2446-48; JA2471-72. Under the
terms of the Debtors' settlements with the AIG Member Companies, the
AIG Member Companies have a contingent entitlement to satisfy some of
these "reimbursables" through the APG Silica Trust. JA2449; JA2473.
Nevertheless, no such "reimbursables" will even be generated unless
coverage for silica claims is accessed under the AIG Member Companies'
policies.

*(Continued on following page)*

precisely of the speculative and "far removed" nature that cannot qualify them as

"persons aggrieved." *See, e.g., Pittsburgh Corning*, 260 Fed. Appx. at 466, 2008

WL 101747 at *2; *Combustion Engineering*, 391 F.3d at 218-19.

The Insurers' appeal is similar to that in *Travelers Ins. Co. v. H.K. Porter*

*Co.*, 45 F.3d 737 (3d Cir. 1995), where a debtor's insurer sought to appeal an order

---

*(Continued from previous page)*

> For those "reimbursables" that relate to policies issued to the Debtors, the AIG Member Companies have no right to any cash payment from the APG Silica Trust at all; rather, they have a right to offset any coverage payment obligation they owe to the trust up to the amount the AIG Member Companies may be entitled to receive as "reimbursables." JA2447. Thus, the AIG Member Companies will have no right to this set-off unless and until the APG Silica Trust -- funded already with $35.5 million in cash proceeds and the right to proceeds from other policies -- seeks to access coverage under the AIG Member Companies' policies, and the AIG Member Companies provide coverage for silica claims to the APG Silica Trust.

> The "reimbursables" relating to policies issued to General Refractories are not tied to coverage of claims resolved by the APG Silica Trust, but rather to coverage of silica claims in the tort system against General Refractories. JA2472-73. The AIG Member Companies will only have a right to access APG Silica Trust funds once the AIG Member Companies exhaust approximately $1.4 million in other sources devoted to paying those "reimbursables." JA2473. Short of that, the AIG Member Companies have no recourse to the APG Silica Trust for this part of its claim.

> Thus, absent speculation, there is no way to verify presently whether the AIG Member Companies will ever have any right to a set-off or monetary payment from the APG Silica Trust. Any suggestion that their claim is "imminent," "actual" or anything more than hypothetical, is meritless and misleading.

that allowed the debtor's creditors to seek recovery on their claims against the

debtor only to the extent the debtor had insurance for those claims. *See id.* at 740.

The insurer, Travelers, denied that it had any liability to the claimants, and the

order in question made no determination of Travelers' coverage obligation or even

the existence of coverage for the subject claims. *See id.* Nevertheless, Travelers

claimed an injury from the order, insofar as the claimants might someday attempt

to access coverage that might (or might not) exist under Travelers' policies. *See*

*id.* at 741-42.

This Court held that Travelers was not a "person aggrieved," and therefore

lacked standing to appeal, "as its interest is too contingent to have been 'directly

affected' by the order" of which Travelers sought reversal. *Id.* at 742. The Court

further explained:

> Travelers' potential exposure is doubly removed, turning both
> on the success of the Claimants in their prosecution of claims
> against [the debtor], and on a judicial determination that the
> policy issued by Travelers covers the claims, a construction
> which Travelers strenuously rejects. . . . Clearly, to allow
> appellate standing under such circumstances would be
> inconsistent with the "directly affecting" standard and the
> policies which underlie this standard.

*Id.*

Allowing the Insurers to appeal here would be no less inconsistent with this

Court's law on appellate bankruptcy standing than the insurer's appeal in

*Travelers.* The Insurers' alleged injuries are based on multiple layers of

contingency, and even the most generous view of their alleged injuries fails to

suggest that the Bankruptcy Court's confirmation order "directly or immediately

impacts [their] pecuniary interests." *Id.* As such, the Insurers' appeals from the

confirmation order should be dismissed for lack of standing.

## IV. The Plan Provides An Appropriate, Equitable Process For Resolving Silica Claims, And Does Not Violate Bankruptcy Code § 502(a).

The AIG Member Companies argued to the Bankruptcy Court that the GIT

Plan improperly classifies all silica claims together because, in the AIG Member

Companies' opinion, the Debtors have better defenses to some silica claims that to

others. The Bankruptcy Court rejected that argument, finding the Debtor's

classification of silica claims to be fair and reasonable. JA65-67; JA153-54. In the

District Court, the AIG Member Companies again argued that the classification of

silica claims under the Plan was inequitable because not all defenses to such claims

were being preserved or pursued. Again, the District Court rejected that argument.

JA25-27.

Now, for the first time, the AIG Member Companies argue that the GIT Plan

cannot be confirmed because it provides for resolution of claims in a manner

inconsistent with § 502 of the Bankruptcy Code. Assuming that the Court is

willing to consider an argument that was not raised below (*see* cases cited *supra*, p.

35), it should reject this attack on the Plan as well.

A.    **The Plan Is Not Inconsistent With § 502, Nor Does § 502 Give The AIG Member Companies Any Additional Basis To Object To The GIT Plan.**

The AIG Member Companies assert that under § 502 of the Bankruptcy Code, the Bankruptcy Court must analyze every claim and disallow any claim for which there is a proven state law defense. This is inaccurate. In fact, § 502(b)(1) provides (in relevant part) that *if* an objection to a claim is interposed, courts are to allow the claim except to the extent that "such claim is unenforceable against the debtor and property of the debtor, *under any agreement or applicable law* . . . ." 11 U.S.C. § 502(b)(1) (emphasis added). Although the AIG Member Companies focus on the allowability of claims under applicable state law, the plain language of the statute clearly provides the alternative of allowance of claims pursuant to agreement. Nothing in § 502 gives any creditor a right to object to every claim against a debtor, as the AIG Member Companies suggest.

The AIG Member Companies' view of the Code's mandates on claim resolution also is incomplete. Section 502 is not, as they imply, the *sole* Code provision that deals with the resolution of claims. Bankruptcy Rule 9019 allows a debtor to compromise or settle a claim, without having to go through the § 502 process before the bankruptcy court. *See* Fed. R. Bankr. P. 9019(a)-(b). Moreover, Rule 9019 allows the bankruptcy court to approve compromises not

only with individual claimants, but also with classes of claimants. *See* Fed. R. Bankr. P. 9019(b).

The GIT Plan is consistent with both § 502 and Rule 9019. Just as the AIG Member Companies' contingent claims against the Debtors were settled through an agreement approved pursuant to Rule 9019 (JA2441-84), in which they voluntarily agreed to have portions of those claims transferred to the APG Silica Trust (JA2447; JA2472-73), the Debtor likewise settled with the class of holders of A.P. Green silica claims through the GIT Plan, which settlement was approved by over 98% of the silica claimants voting in the class and confirmed by the Bankruptcy Court (JA147; JA200).

It is well settled that a "confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike." *See First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough*, 81 F.3d 1310, 1317 (4th Cir. 1996); *see also In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362 (E.D. Pa. 1996); *In re Ampace Corp.*, 279 B.R. 145, 160 (Bankr. D. Del. 2002). Nothing in the Bankruptcy Code prohibits such an agreement that provides a resolution process for claims. Having unsuccessfully challenged the Debtors' settlement in

the confirmation proceeding, the AIG Member Companies cannot derive any

additional basis to disturb the settlement under § 502.[25]

**B.      The Debtor's Decision Not To Pursue All Possible
          Defenses To Silica Claims Is Reasonable And Equitable.**

The Debtors are faced with thousands of current A.P. Green silica claims,

and expect tens of thousands of additional claims in the future.  The AIG Member

Companies claim -- citing a single Pennsylvania case (*Phillips v. A-Best Products

Co.*, 665 A.2d 1176 (Pa. 1995)) -- that there are good defenses to many of these

claims.  However, because these silica claims are bodily injury claims, each

claimant has a right to a jury trial in the district court where his claim arose.  *See*

28 U.S.C. §§ 1411 (right to trial by jury), 157(b)(5) (appropriate venue).  This

reveals a fatal flaw in the AIG Member Companies' reliance on *Phillips* as the

basis for its argument.

The fact that Pennsylvania law may recognize certain defenses to silica

claims cannot be taken to suggest that any other jurisdiction would recognize the

---

[25]     Importantly, nothing in the GIT Plan requires the AIG Member Companies
         (as insurers) to provide any insurance for any silica claims channeled to the
         APG Silica Trust, since all of their coverage defenses have been preserved
         by the GIT Plan's "insurance neutrality" provisions.  *See supra*, pp. 32-33
         n.14, 43-45.

same defenses -- and the AIG Member Companies cannot say they would.[26]  In

order to assert defenses to *all* silica claims, the Debtors (and, according to the AIG

Member Companies, any party in interest) would have to get involved in numerous

costly jury trials, in multiple jurisdictions, with different applicable laws, to test for

the extent of the defenses available to them.  The expense of such an undertaking

would be substantial, and the risk to the Reorganized Debtors enormous.  As the

Bankruptcy Court correctly found based on the record evidence, even one

significant adverse jury verdict could threaten the Reorganized Debtors' viability.

JA62-63.

    In light of the significant cost and uncertainty involved in pursuing all

possible defenses to silica claims, the Debtors' decision to establish a trust to

which they will make a fixed contribution of funds that might not otherwise be

available to resolve A.P. Green silica claims is not just reasonable; it is the only

rational choice.  The APG Silica Trust also has the added advantage of satisfying

the Bankruptcy Code's goal of treating similarly situated creditors equally.  JA64.

If the Debtors were to litigate the allowance of APG Silica Claims, these claims

would be valued by juries around the country applying the laws of various states

---

[26]    The AIG Companies give no reason why, for example, a district court in
Louisiana, hearing the case of an individual exposed in Louisiana to a
product manufactured by A.P. Green in Missouri, would apply
Pennsylvania's law on applicable defenses to silica claims.

and potentially awarding disparate damages for similar injuries. In short, what the

AIG Member Companies advocate is a situation that is anything but "fair" or

"equitable" to holders of A.P. Green silica claims.

### C. Congress Has Specifically Recognized The Need For Special Claims Resolution Procedures In Mass Tort Cases.

In order to deal with the special problems involved in a bankruptcy caused

by mass tort claims, Congress enacted § 524(g) of the Bankruptcy Code. Although

that section specifically applies to asbestos claims, the APG Silica Trust was

intentionally structured to comply with the requirements of § 524(g), and as

discussed above, reference to that section is useful here. Section 524(g)(2)(B)-

(ii)(V) provides:

> The trust will operate through mechanisms such as structured,
> periodic, or supplemental payments, pro rata distributions,
> matrices or periodic review of estimates of the numbers and
> values of present claims and future demands, or other
> comparable mechanisms that provide reasonable assurance that
> the trust will value, and be in a financial position to pay, present
> claims and future demands that involve similar claims in
> substantially the same manner.

11 U.S.C. § 524(g)(2)(B)-(ii)(V).

This provision demonstrates Congress's recognition that in a mass tort

situation, settlement trusts, and not the courts, are the only practical vehicles for

valuing thousands of claims fairly and equitably. Indeed, federal courts recognized

this even before Congress added § 524(g) to the Bankruptcy Code. *See, e.g.,*

*Johns-Manville*, 837 F.2d at 90; *UNARCO Bloomington Factory Workers v. UNR Indus., Inc.*, 121 B.R. 268, 272, 282-83 (N.D. Ill. 1990).  As a result, any asbestos-related Chapter 11 case that has resulted in the imposition of a § 524(g) or comparable injunction has been structured to have a trust -- rather than the courts -- handle the liquidation and payment of claims.

The Debtors have found no cases (and the AIG Member Companies cite none) which hold that § 502 is the only means by which claims may be valued in a mass tort situation.  Quite the contrary:  in *In re ACandS Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004), Judge Newsome specifically rejected the argument the AIG Member Companies are making here, ruling that "to the extent that the plan limits the right . . . to object to claims under § 502(a), that limitation is consistent with § 524(g)(2)(B)(u)(V)." *Id.* at 42.  The same rationale applies to the APG Silica Trust established in the GIT Plan under §105(a).

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## **CONCLUSION**

This Court should affirm the rulings of the District Court and the

Bankruptcy Court which confirmed the Debtors' Chapter 11 plan of

reorganization.


Dated:  January 30, 2009                    Respectfully submitted,

                                            /s/ James J. Restivo, Jr.
                                            Paul M. Singer, Esq.
                                            (Pa. I.D. No. 00286)
                                            James J. Restivo, Jr., Esq.
                                            (Pa. I.D. No. 10113)
                                            David Ziegler, Esq.
                                            (Pa. I.D. No. 37527)

                                            REED SMITH LLP
                                            435 Sixth Avenue
                                            Pittsburgh, PA 15219
                                            Phone: (412) 288-3131

                                            *Counsel for Appellees*
                                            *Global Industrial Technologies, Inc.,,*
                                                *et al.*

## CERTIFICATION OF BAR MEMBERSHIP (LAR 46.1)

Pursuant to Third Circuit Local Appellate Rule 46.1, I, James J. Restivo, Jr., hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated:  January 30, 2009

/s/ James J. Restivo, Jr.
James J. Restivo, Jr.
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
(412) 288-3131

*Counsel for Appellees*
*Global Industrial Technologies, Inc.,*
*et al.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C)(i), I hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using Microsoft Word 2003.

Additionally, pursuant to LAR 31.1(c), I certify that the text of the brief filed with the Court by electronic mail is identical, except for the signatures, to the text of the paper copies.  I further certify that a virus detection program has been run on the electronic file and that no virus was detected.  I rely on the virus detection program Trend Micro Office Scan, program version 8.0 Service Pack 1, scan engine version 8.911.1001, virus definition file version 5.803.00, in making this representation.

Dated:  January 30, 2009                    /s/ James J. Restivo, Jr.
                                            James J. Restivo, Jr.
                                            REED SMITH LLP
                                            435 Sixth Avenue
                                            Pittsburgh, PA  15219
                                            (412) 288-3131

                                            *Counsel for Appellees*
                                            *Global Industrial Technologies, Inc.,*
                                                *et al.*

## CERTIFICATE OF FILING AND SERVICE

I, James J. Restivo, Jr., hereby certify that on this 30th day of January, 2009, I caused one (1) copy of the foregoing BRIEF FOR APPELLEE GLOBAL INDUSTRIAL TECHNOLOGIES, INC., *ET AL.* to be served by overnight courier (UPS) on the parties to this appeal at the addresses below. I further certify that I caused an electronic copy of the foregoing BRIEF FOR APPELLEE GLOBAL INDUSTRIAL TECHNOLOGIES, INC., *ET AL.* to be served on the parties to this appeal at the electronic mail addresses listed below:

Seth P. Waxman, Esq.
Craig Goldblatt, Esq.
Danielle Spinelli, Esq.
Nancy L. Manzer, Esq.
Catherine M.A. Carroll, Esq.
Lisa Ewart, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com
craig.goldblatt@wilmerhale.com
danielle.spinelli@wilmerhale.com
catherine.carroll@wilmerhale.com
lisa.ewart@wilmerhale.com

William J. Bowman, Esq.
James P. Ruggeri, Esq.
Edward B. Parks, II
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
wjbowman@hhlaw.com
jpruggeri@hhlaw.com
ebparks@hhlaw.com

*Counsel for Appellants Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company*

John D. Demmy, Esq.
Stevens & Lee, PC
1105 North Market Street, Suite 700
Wilmington, DE 19801
(302) 425-3308
jdd@stevenslee.com

Leonard P. Goldberger, Esq.
Stevens & Lee, PC
1818 Market Street, 29th Floor
Philadelphia, PA 19103
(215) 751-2864
lpg@stevenslee.com

Joseph Gibbons, Esq.
Amy E. Vulpio, Esq.
White and Williams LLP
1800 Liberty Place
Philadelphia, PA 19103
(215) 864-7000
gibbonsj@whiteandwilliams.com
vulpioa@whiteandwilliams.com

*Counsel for Century Indemnity Company, as successor to CIGNA Specialty
Company, formerly known as California Union Insurance Company, and
Westchester Fire Insurance Company, for itself and for International Insurance
Company (know known as TIG Insurance Company)*

Beverly Weiss Manne, Esq.
Tucker Arensberg, PC
1500 One PPG Place
Pittsburgh PA 15222
(412) 594-5525
bmanne@tuckerlaw.com

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400
mdavis@zeklaw.com

Joseph Boury, Esq.
Bivona & Cohen, PC
88 Pine Street
New York, New York 10005
(212) 363-3100
joseph.boury@bivonacohen.com

*Counsel for Appellants National Union Fire Insurance Company of Pittsburgh,
PA, Insurance Company of the State of Pennsylvania, Lexington Insurance
Company, American Home Assurance Company, and any other entities related to
American International Group, Inc. that engaged in business transactions with
the Reorganizing Debtors*

Elihu Inselbuch, Esq.
Caplin & Drysdale
375 Park Avenue
35th Floor
New York, NY 10152
(212) 319-7125
ei@capdale.com

Peter Van N. Lockwood, Esq.
Caplin & Drysdale
One Thomas Circle, NW
Washington, DC 20005
(202) 862-5065
pvnl@capdale.com

Douglas E. Campbell, Esq.
David B. Salzman, Esq.
Campbell & Levine
310 Grant Street
Suite 1700
Pittsburgh, PA 15219
(412) 261-0310
dac@camlev.com
dbs@camlev.com

*Counsel for the Appellee Official Committee of Asbestos Creditors*

Robert G. Sable, Esq.
Sally E. Edison, Esq.
McGuire Woods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA 15222-3142
(412) 667-6000
rsable@mcguirewoods.com
sedison@mcguirewoods.com

*Counsel for the Appellee Official Committee of Unsecured Trade Creditors*

Edwin J. Harron,, Esq.
Sharon M. Zieg, Esq.
Young, Conaway, Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
eharron@ycst.com
szieg@ycst.com

Joel M. Helmrich, Esq.
Dinsmore & Shohl, LLP
One Oxford Centre
301 Grant Street
Suite 2800
Pittsburgh, PA  15219
(412) 288-5880
joel.helmrich@dinslaw.com

*Counsel for Appellee Lawrence Fitzpatrick, Legal Representative for Future Asbestos Personal Injury Claimants*


Gary Philip Nelson, Esq.
Sherrard, German and Kelly
28th Floor, Two PNC Plaza
620 Liberty Avenue
Pittsburgh, PA 15222
(412) 355-0200
gpn@sgkpc.com

*Counsel for Appellee Philip Pahigian, Legal Representative for Future Silica Personal Injury Claimants*

Andrea M. Silkowitz, Esq.
Office of the Attorney General of New Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ 07102
(973) 648-4730
andrea.silkowitz@dol.lps.state.nj.us

*Counsel for Amici*

I further certify that, on this 30th day of January, 2009, I caused ten (10) bound copies of the foregoing BRIEF FOR APPELLEE GLOBAL INDUSTRIAL TECHNOLOGIES, INC., *ET AL.* to be filed with the Court via overnight courier (UPS) to the following address:

Office of the Clerk
United States Court of Appeals for the Third Circuit
U.S. Courthouse
601 Market Street, Room 21400
Philadelphia, PA 19106-1790
(215) 597-2995

I also certify that an electronic copy, in .pdf format, of the foregoing BRIEF FOR APPELLEE GLOBAL INDUSTRIAL TECHNOLOGIES, INC., *ET AL.* was filed with the Office of the Clerk via the Court's electronic filing system, pursuant to LAR 113.1.

/s/ James J. Restivo, Jr.
James J. Restivo, Jr.